In re LABRUM & DOAK, LLP, Debtor.

LABRUM & DOAK, a Pennsylvania General Partnership, Plaintiff,

v.

John R. BROWN, Esquire, Thomas C. Kaczka, Esquire, Stephen J. Springer, Esquire, John E. Salmon, Esquire, Carl R. Fogelberg, Esquire, Joseph L. Turchi, Esquire, Gregg I. Zeff, Esquire, Ronald J. Uzdavinis, Esquire, Eileen Warner Strulson, Esquire, Kenneth H. Kell, Esquire, John L. White, Esquire, Kevin M. Bothwell, Esquire, Edwin F. McCoy, Esquire, Karen Ashdale, Esquire, John M. Bernard, Esquire, Michael G. Brenna, Esquire, Barbara L. Hollenbach, Esquire, Kellie Allen, Esquire, Perry S. Bechtle, Esquire, John Cookson, Esquire, John Daly, Esquire, Patrick Gibbons, Esquire, Michael T. McDonnell, Esquire, Helene Parise, Esquire, David J. Parsells, Esquire, John Penberthy, Esquire, Jay A. Gabbier, Esquire, John D. Luce, Esquire, Joseph A. Ricchezza, Esquire, Daniel Ryan, Esquire, Craig Styer, Esquire, John H. Osorio, Esquire, J. Mark Pecci, II, Esquire, Robert Stern, Esquire, Robert Blanck, William Longo, John McAllister, Esquire, Ryan, Brown, McDonnell, Berger & Gibbons, Marshall, Dennehey, Warner, Coleman & Goggin, Rawle & Henderson, Fogelberg & Associates, P.C., Frost, Syzamanski & Zeff, Holston, MacDonald, Morgan & Uzdavinis, Mondelli & Carbone, Korn, Quattrone, Blumbert & Chance, Tallmen, Huddes, & Sorrentino, Weinstein, Kitchenof, Scarlotto & Goldman, Dugan, Brinkman, Maginnis & Pace, Harvey, Pennington, Herting & Renneisen, Stevens & Lee, Jay A. Gabbier, Schubert, Bellwoar, Cahill & Quinn, Simasek, Ruzzi & McKee, Stradley, Ronon, Stevens & Young, Margolis & Edelsltein, Defendants.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0134DAS.

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Aug. 14, 1998.

See also 222 B.R. 749.

Neal D. Colton, Mark E. Felger, Philadelphia, PA, for debtor.

David Smith, Schnader Harrison Segal & Lewis, LLP, Philadelphia, PA, Robert J. La-Rocca, Ryan, Brown, McDonnell, Berger & Gibbons, Philadelphia, PA, Joseph Riga, Whittlesey McDowell & Holtz, Maple Shade, NJ, for Ryan Firm Defendants.

Jonathan D. Herbst, Philadelphia, PA, for Margolis & Edelstein.

Paul J. Winterhalter, Philadelphia, PA, for petitioners & Former Partners' Committee.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Unsecured Creditors' Committee.

Lawrence J. Tabas, Obermayer, Rebmann, Maxwell & Heppel, LLP, Philadelphia, PA, for BECII—1818 Ltd.

J. Scott Victor, Saul, Ewing, Remick Saul, LLP, Philadelphia, Pa, for John M. Bernard.

Barry E. Bressler, Perlino & Lentz, PC, Philadelphia, PA, for Liberty Property L.P.

David Searles, Donovan Miller, LLP, Philadelphia, PA, for Kellie Allen.

John J. Winter, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for John Daly.

Evan Harrison Snyder, Feldman & Pinto, Philadelphia, PA, for Helene Parise.

Kevin W. Walsh, Adelman, Lavine, Gold & Levin, PC, Philadelphia, PA, for John D. Lucey.

Thomas P. Wagner, Rawle & Henderson, LLP, Philadelphia, PA, for Rawle & Henderson.

Matthew R. Sorrentino, Tallman, Hudders & Sorrentino, Allentown, PA, for Tallman, Hudders & Sorrentino.

Paul J. Scarlato, Weinstein Kitchenoff Scarlato & goldman, Philadelphia, PA, for Weinstein, Kitchenof, Scarloto & Goldman.

Gregg L. Zeff, Frost Zeff, Pier Five at Penn's Landing, Philadelphia, Pa, for Frost, Syzamanski & Zeff.

James E O'Neill, III, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Stradley, Ronon, Stevens & Young.

Joseph Diorio, Philadelphia, PA, for Peter Neeson, Stephen J. Springer & Jon E. Salmon.

Robert Lapowski, Wayne, PA, for Michael J. Carr & David J. Parsells.

Robert D. Greenbaum, Saul, Ewing, Remick & Saul, LLP, Philadelphia, PA for Jack Bernard.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean K. McDonald.

Robert M. Kline, Philadelphia, PA, for CNA.

Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Perry S. Bechtle, & Daniel, Ryan.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

A. *INTRODUCTION*

In the instant Opinion, we decide, to the extent we are able on this record, perhaps the most controversial litigation arising out of this Chapter 11 bankruptcy of a dissolved law firm, LABRUM & DOAK, LLP ("the Debtor"). In the instant proceeding ("the Proceeding") the Debtor seeks to recover fees for services and reimbursement for costs previously invested on contingent-fee cases commenced by the Debtor from certain of its former attorneys and their new law firms who are handling these cases after the Debtor's dissolution.

Although the Complaint names thirty-seven (37) former partners and associates, seventeen (17) law firms, and one unrelated individual as defendants, it has been reported that settlement have been negotiated with all of the defendants except (1) EDWIN J. MCCOY, ESQUIRE ("McCoy"), a former partner who departed from the Debtor under the terms of a Termination Agreement of December 16, 1995 ("the McCoy Agreement"); (2) the new law firm of RYAN BROWN McDONNELL BERGER & GIBBONS ("the Ryan Firm") and four members of that firm, DANIEL J. RYAN, ESQUIRE, JOHN R. BROWN, ESQUIRE, MICHAEL J. McDONNELL, ESQUIRE, and PATRICK GIBBONS, ESQUIRE (with the Ryan Firm, collectively, "the Ryan Firm Defendants"); and (3) WILLIAM LONGO, ESQUIRE ("Longo"), apparently included as a party because the only former case of the Debtor with which he is involved is a disputed matter now handled by the Ryan Firm, in which he claims a referral fee.

The disputes with McCoy are relatively easy to resolve, because they are subject to the McCoy Agreement and, would that not apply, to the Partnership Agreement ("the PA") of the Debtor. The most difficult issues regarding McCoy are determining his rights to setoff, which we allow in part in arriving at a present claim of $18,280.94, plus future rights to recoveries on a few unresolved cases.

The disputes involving the Ryan Firm Defendants are more difficult to resolve. As in the case of the tax recapture liability issue which we resolved in *In re LaBrum & Doak, LLP*, 222 B.R. 749 (Bankr.E.D.Pa.1998) ("*LaBrum VI*"), the absence of any express written or oral agreement among the parties, which is surprising in matters involving lawyers, or clear precedent in this area, complicates the decision-making process. As the Ryan Firm Defendants point out, the Debtor's partnership-law theories clearly do not apply and the Debtor's attempt to fashion a usable formula for computing the Debtor's interests was not proven by competent evidence. The Debtor is therefore compelled to resort to the theory of *quantum meruit*. We agree with the Debtor that unjust enrichment to the Ryan Firm Defendants would apparently result if we denied all of the Debtor's claims under this theory. However, the Debtor has proven its right to only limited recoveries under *quantum meruit* on this record. We nevertheless deem it appropriate to give it a further opportunity, in light of our rulings, to establish its rights as to at least those cases which are resolved, with other matters necessarily to remain open. We also deny all of the Defendants' counterclaims except to the extent we allow certain setoffs to McCoy. Finally, we declare that Longo is entitled to his claimed referral fee when the case pertinent to this claim is resolved.

B. *FACTUAL AND PROCEDURAL HISTORY*

The procedural history of the Debtor's main bankruptcy case and mention of the four significant adversary proceedings initiated in its course are outlined in *LaBrum VI*, at 752–53, to which, reference having been made, will not be repeated here except where necessary. We reiterate that this case was filed as an involuntary Chapter 7 case on January 6, 1998, and was converted by the Debtor to a Chapter 11 case on January 22,

1998. The confirmation process remains "on hold." We recently allowed the Debtor to set back the date of filing its proposed partially-consensual amended plan referenced in *LaBrum VI*, at 752–53, from August 7, 1998, to August 28, 1998.

The Proceeding was filed on March 4, 1998. The Ryan Firm Defendants moved this court to dismiss it on March 27, 1998. This motion was denied in an Order/Memorandum reported as *In re LaBrum & Doak, LLP*, 1998 WL 184413 (Bankr.E.D.Pa. April 16, 1998) ("*LaBrum I*"). The Ryan Firm Defendants next demanded a jury trial and attempted to have the District Court for that reason withdraw the reference of the Proceeding. However, we struck the jury demand in the course of a decision reported as 1998 WL 233749, at *2–*4 (Bankr.E.D.Pa. May 8, 1998) ("*LaBrum II*"), which resolved several other matters, including the Ryan Firm's motion for relief from the automatic stay to take actions to strike charging liens imposed by the Debtor against its contingent-fee cases in the various state courts in which the cases were pending.[1]

█ The Ryan Firm subsequently pressed not only the motion to withdraw the reference but also a mandamus action against this court in the District Court.[2] The motion to withdraw the reference was denied in an unreported Order of May 25, 1998, by the Honorable Jay C. Waldman of the District Court ("*LaBrum VI*"), which stated that he "did not find particularly persuasive" the Ryan Firm Defendants' argument based upon the cases cited at page 98 *infra*. The jury trial issues apparently remain alive not only as a ground for appeal, but also in the form of a petition for mandamus now filed by the Ryan Firm Defendants in the Third Circuit Court of Appeals, at No. 98–1423.

A 16–hour trial of the Proceeding was conducted between June 8, 1998, and June 11, 1998. Settlements with many of the Defendants were reported at the outset of the trial and a few more during and after the trial. As previously stated, only McCoy, the Ryan Firm Defendants, and Longo remain as active party defendants. At trial the Debtors called its dissolution partner, Peter Neeson; Janet Roedell, its former facilities manager who is presently in charge of its dissolution team; and, as of cross-examination, Defendants McCoy, Ryan, and Gibbons. The Ryan Firm, presenting the principal defense, called William Dixon, the owner of Creative Copier Service, a Ryan Firm client who had been dissatisfied with the Debtor's representation and resorted to the Ryan Firm as his counsel; Ryan; and (at great length) Brown. McCoy presented lengthy testimony *pro se*. The Debtor briefly called Longo and Neeson in rebuttal. The Debtor's case featured a chart which compiled the total hours and costs expended on each of over 100 contingency-fee cases serviced by the Debtor and transferred to other counsel at or prior to its dissolution.

At this point, we note that the McCoy facts are quite distinct from those of the other remaining defendants. As is noted above, McCoy left the Debtor as a partner at the end of 1995, prior to its dissolution, under the terms of the McCoy Agreement. The McCoy Agreement contained provisions for the sharing of fees on several specific contingency-fee cases which he took with him. It also provided that McCoy would receive a termination benefit payment of $100,000 to be paid in 24 installments of $4166.66. The issues which have arisen in addition to disputes regarding cases referenced in the McCoy Agreement and a few that are not are (1) whether McCoy is entitled to set off an admitted delinquency of $50,000 in the termination benefit payments due against sums which he owes the Debtor in the cases taken; (2) in what amount McCoy is entitled to

---

**1.** This issue was resolved by our basically memorializing an agreement between the parties that the liens would be voluntarily withdrawn when all of the disputed fees and costs were deposited into escrow. *LaBrum II*, at *1–*2, *4–*5.

**2.** It would appear to this court that mandamus was inappropriate because a prerequisite of mandamus is that no other adequate means to obtain the relief sought may exist, *see, e.g., Kerr v. United States District Court for the Northern District of California*, 426 U.S. 394, 403, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976), and an interlocutory appeal of any aspect of our orders by the District Court was possible. *See* 28 U.S.C. Section 158(a)(3).

compensation for serving as a liaison with former partners concerning, *inter alia*, the tax recapture issue decided in *LaBrum VI* and whether this compensation be set off against his liability to the Debtor; and (3) whether McCoy is entitled to any damages or setoffs because, after his termination, the Debtor allegedly failed to properly deliver mail or refer phone messages to him.

The remainder of the disputes, all involving the Ryan Firm Defendants, revolve around the transfers of the Debtor's cases at dissolution. Difficulties arise because, although conversations between Neeson and Brown regarding the disposition of these cases occurred, there was no written agreement regarding their disposition and, as we find, no clear oral agreements, either. Approximately three weeks after the dissolution physically occurred on July 31, 1997, the Debtor's counsel met with the Ryan Firm and made the demand which it made from all of the departing attorneys at that point for its fees and costs in the removed contingent-fee cases: upon settlement of the cases, it requested reimbursement of all costs and half of the fee received if the matter did not go to trial and one-third of the fee if the matter were tried ("the Half/Third Proposal"). This demand was perceived by the Debtor as a compromise, because certain case authorities from other jurisdictions, notably *Jewel v. Boxer*, 156 Cal.App.3d 171, 203 Cal.Rptr. 13 (1984); *Sullivan, Bodney & Hammond v. Bodney*, 16 Kan.App.2d 208, 820 P.2d 1248 (1991); and *Resnick v. Kaplan*, 49 Md.App. 499, 434 A.2d 582 (1981), were believed by the Debtor to support the notion that the Debtor was entitled to *all* of the fees and costs generated by these cases after they were removed.

Unlike, at this point, all of the other defendants similarly situated, the Ryan Firm Defendants refused to Half/Third Proposal and refused to pay the Debtor any share of its fees or costs, apparently relying on the decisions in *Solo v. Padova*, 21 PHILA.CO.RPTS. 22 (Phila.Co.C.P.1990), and the appellate authorities on which the *Solo* court relies, principally *Lamparski v. Sikov, Lamparski & Woncheck*, 384 Pa.Super. 491, 498–99, 559 A.2d 544, 547–48 (1989), *appeal*

*denied*, 524 Pa. 609, 569 A.2d 1368 (1990); *DeMasi v. DeMasi*, 366 Pa.Super. 19, 38–44, 530 A.2d 871, 881–83 (1987), *appeal denied*, 517 Pa. 631, 539 A.2d 811 (1988); and *Beasley v. Beasley*, 359 Pa.Super. 20, 39–41, 518 A.2d 545, 554–56 (1986), *appeal denied*, 516 Pa. 631, 533 A.2d 90 (1987).

This controversy escalated when the Debtor filed charging liens in about a dozen state courts where the more lucrative cases being handled by the Ryan Firm Defendants were pending. The liens were removed under the terms described in *LaBrum II*. However, battle lines were drawn in a controversy among lawyers which is, in our view, not controlled by either an enforceable agreement or case precedent. The predictable outcome of litigation probably equally as expensive as the amounts in controversy has ensued.

Furthermore, as we explained in *In re LaBrum & Doak, LLP*, 1998 WL 404301, at *1 (Bankr.E.D.Pa. July 16, 1998) ("*LaBrum V*"), the Ryan Firm Defendants, apparently inconsistently with their defense in the Proceeding and possibly motivated by some measure of vindictiveness, insisted that the Debtor, despite its reluctance to do so, should pursue its former attorneys for recoveries in *non*-contingent-fee matters and cases as vigorously as the contingent-fee cases. The Ryan Firm filed a motion to obtain appointment of its chosen counsel to pursue that litigation as well as the Proceeding. That motion was resolved in a decision reported as *In re LaBrum & Doak, LLP*, 1998 WL 246530 (Bankr.E.D.Pa. May 14, 1998) ("*LaBrum III*"), holding that the Official Committee of Unsecured Creditors ("the UC Committee") should pursue that litigation. That decision has spawned Adversary No. 98–0273 ("Adv.273"), in which the UC Committee seeks, similar to the instant Proceeding, recoveries from former attorneys of the Debtor in non-contingent-fee matters and cases. That proceeding is now scheduled for trial on September 9, 1998. *See LaBrum VI*, at 752–53. To complete the picture, we also reference a fourth proceeding initiated by the Official Committee of Former Partners at Adversary No. 98–0393 to avoid certain 1997 distributions to the remaining partners as

fraudulent conveyances, now scheduled for trial on September 2, 1998.

After the completion of the trial the parties agreed that the Debtor's opening brief would be submitted by June 29, 1998; the defendants so desiring would file their opposing briefs by July 10, 1998; and the Debtor could reply July 17, 1998. By agreement of the parties, we extended this schedule for one week in an Order of June 25, 1998.

In its opening brief the Debtor argues that (1) the contingent-fee cases are property of its estate, citing *Turner v. Avery*, 947 F.2d 772, 774 (5th Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992); *Carlson v. Brandt*, 1997 WL 534500, at *7–*8 (N.D.Ill. Aug. 22, 1997); *Banner v. Bagen*, 201 B.R. 642 (S.D.N.Y.1996); and *In re Jess*, 215 B.R. 618 (9th Cir. BAP 1997); and (2) it is entitled to compensation on a *quantum meruit* basis, citing principally *Schenley Distillers Corp. v. Kinsey Distilling Corp.*, 136 F.2d 350 (3d Cir.1943); *In re Sacerdote* 74 B.R. 487 (Bankr.E.D.Pa.1987); and *Johnson v. Stein*, 254 Pa.Super. 41, 385 A.2d 514 (1978). The Debtor continues to urge us to impose the Half/Third Proposal on the Ryan Firm Defendants, but alternatively requests that we adopt a case-by-case approach in determining the amounts justly due to it.

McCoy and the Ryan Firm both submitted opposing briefs. McCoy argues that he is entitled to set off an earlier agreed liability of $84,133.71 to the Debtor with the $50,000 delinquent termination payments, $21,332.40 for his services as a liaison counsel with former partners, and $29,750 in "unpaid capital," creating a liability of $11,248.69 of the Debtor to him, plus recover $150,000 for the Debtor's alleged denial of his access to mail and telephone.

The Ryan Firm argues as follows: (1) the *Jewel v. Boxer* theory, which appears to have been abandoned, cannot apply because none of the Ryan Firm Defendants were "true" partners of the Debtor; (2) the purported holding of *Solo:* that liability for compensation is not imposed upon successor counsel in contingent-fee cases in any circumstances; (3) the Debtor's claims for *quantum meruit* can lie only against the Debtor's clients, citing *Fowkes v. Shoemaker*, 443 Pa.Super. 343,

661 A.2d 877 (1995), *appeal denied*, 544 Pa. 609, 674 A.2d 1072 (1996); *Hiscott & Robinson v. King*, 426 Pa.Super. 338, 626 A.2d 1235 (1993), *appeal denied*, 537 Pa. 641, 644 A.2d 163 (1994); and *Styer v. Hugo*, 422 Pa.Super. 262, 619 A.2d 347 (1993), *aff'd*, 535 Pa. 610, 637 A.2d 276 (1994); (4) the Debtor's attempted invocation of the Half/Third Proposal has not been supported by evidence, nor have damages on a case-by-case analysis been proven in conformity with the standards set forth in *Paul v. Horton*, 1996 WL 297572, at *8 (E.D.Pa. May 22, 1996); and (5) they are entitled to judgment on their counterclaims for $12,138 paid to the Debtor by Allstate Insurance Co. ("Allstate") for work which was ultimately performed by the Ryan Firm, and an unliquidated sum for alleging illegally filing the now-removed charging liens in certain of its cases.

In its reply brief the Debtor responded only to the counterclaims, asserting that they were barred by the automatic stay, should be relegated to the claims process, or dismissed for lack of merit.

Finally, we note that, on August 12, 1998, just prior to issuing this decision, we approved uncontested motions which (1) sought a default judgment imposing the Half/Third Proposal upon Defendant CARL R. FOGELBERG, ESQUIRE; and (2) approved uncontested settlements effectuating the Half/Third Proposal as to numerous other defendants.

## C. DISCUSSION

1. *The Debtor's Claims for Fees and Costs Expended Prior the Transfer of Its Cases are Property of Its Estate Which Are Recoverable by It.*

Before attempting any resolutions of the very different claims asserted by the Debtor against McCoy and the Ryan Firm Defendants, respectively, we will address a few common issues. First, as apparently was supported by Judge Waldman in *LaBrum VI*, we believe that the Debtor is justified in asserting rights against future contingent-fee recoveries in cases which it transferred to other counsel. In other words, we do not read the *Solo* case and the cases which allegedly support it as carving out a unique Pennsylvania-law-based excep-

tion to the principles uniformly established in *Turner v. Avery* and the other cases cited at page 99 *supra*. The principles established in the equitable distribution cases relied upon by *Solo* appear inappropriately adapted here. At least to the instant facts, those cases declined to value contingency-fee cases at issue before them because those cases would have had to have been assigned some present value in order to fit into an overall scheme of equitable distribution. The process that requires a partnership such as the Debtor to continue until its winding-down is complete is significantly different from an equitable distribution in a divorce, where future income is not considered. *Compare McCabe v. McCabe*, 525 Pa. 25, 30, 575 A.2d 87, 89 (1990), citing *Hodge v. Hodge*, 513 Pa. 264, 269, 520 A.2d 15, 17 (1980).

The Ryan Firm Defendants further contended that the Debtor failed to plead the recovery of its costs in the Complaint and therefore must be deemed to have abandoned that claim. Although the Complaint is not a model of clarity, the Debtor clearly did raise costs as on item to which it was entitled at ¶¶ 67, 70, and 72 of the Complaint. Even though these assertions were made in the Background section of its pleading rather than in the Counts demanding relief, we must construe the pleadings as so requesting same to do substantial justice, especially since evidence on same was presented at trial without objection and hence without any degree of lack of notice or unfair prejudice to the Defendants.

2. *The Debtor's Claims Against McCoy, Which Are Controlled by the McCoy Agreement and the Debtor's Partnership Agreement, Entitle the Debtor to a Judgment of $18,280.94, After Allowing Credit for McCoy's Legitimate Set-offs, Plus a Claim for a Recovery in Three Unfinished Cases.*

McCoy, a long-time partner of the Debtor, left the firm on December 31, 1995, prior to its dissolution, pursuant to the terms of the McCoy Agreement which he negotiated, principally with Ryan acting on behalf of the Debtor. The McCoy Agreement allowed McCoy to take certain client files with him and specified what the Debtor's interests in these matters would be should there by any recovery in these cases. Five of McCoy's cases in which the Debtor asserts an interest are referenced in the McCoy Agreement: *Behrens, Gorenstein, Jenkins, McDonough,* and *Shipman*.[3] Two others are not referenced therein: *Cole* and *Schwartz.*

As to the *Behrens* case, the McCoy Agreement calls for Debtor to receive costs plus 10% of the first $50,000 received as attorney's fee and 20% of the next $50,000. In a letter dated April 17, 1997, McCoy acknowledged owing costs of $27,692.39 plus $15,000 in fees in reference to this case. The Debtor, in its post-trial brief, asserts the amount for costs is $28,791.49, based on the records of the firm. Although the parties do not address this discrepancy, McCoy's letter of April 17, 1997, claims that the judge who presided over the trial of this matter disallowed $1,020.00 of the Debtor's costs. Having no reason to doubt McCoy's assertion in this matter and in the absence of argument by the Debtor, and attributing the remaining discrepancy of $79.10 to an error by McCoy as to the initial amount, we find that the proper amount of costs to be $27,771.49. Thus, McCoy owes the Debtor $42,771.49 in connection with the *Behrens* matter.

In the *Gorenstein* case, the agreement called the Debtor to receive 40% of the attorney's fee plus its cost. In the letter of April 17, 1997, McCoy represented that 40% of his fee was $23,331.10 and that the Debtor's costs were $6,572.62. The Debtor did not contest McCoy's calculation of this fee, although it claimed that its costs were a slightly lower amount, $6,570.62. Using the Debtor's figure, McCoy owes the Debtor $24,001.72 on the *Gorenstein* case.

---

3. In its reply brief, the Debtor for the first time mentions a new matter, the *Trojan* case. Although this case does appear to be mentioned in the McCoy Agreement, there was no testimony about this case at trial, and McCoy has therefore had no opportunity to respond on matters related to this case. Since evidence about subsequent developments or agreements proved important in deciding other issues affected by the McCoy Agreement, we will not include any claim arising from this tardily-referenced case in our decision.

In the *Jenkins* case, the McCoy Agreement called for the Debtor to receive its costs and 40% of the attorney's fee. McCoy testified that as yet no recovery has been made in this case. The Debtor asserted that its costs in this matter were $9,677.54 and McCoy did not challenge this amount. We do note that the McCoy Agreement does provide an escape clause calling for renegotiation of the fee split if the attorney's fee portion of a recovery is so small that the Debtor's costs consume half or more of the attorney's fee. McCoy owes nothing currently with respect to this case, although he may owe the Debtor for fees and costs upon its completion.

In the *McDonough* case, the Agreement called for the Debtor to receive compensation for its time and costs, among several other parties also having a claim to part of the fee. However, the uncontradicted testimony of McCoy was that this file did not, in fact, leave the Debtor with him, but instead that this case was subsequently transferred by the Debtor to Michael Berman, a lawyer in Delaware, in return for a guarantee of the Debtor's costs in the amount of $5,700 should there by a recovery. Later, when Berman transferred the case to McCoy, the Debtor apparently required McCoy to guarantee its costs in writing before it would release its file to him. McCoy introduced as evidence his letters, dated April 16 and April 18, 1996, to that effect and a confirming letter from James Hausch, then the firm's administrative partner, dated April 19, 1996. In view of this evidence that the initial terms in the McCoy Agreement never became effective due to the failure of the Debtor to transfer this file to McCoy, the subsequent agreement controls, and we find that McCoy owes the Debtor only the $5,700 costs in connection with this matter.

In the *Shipman* case, the McCoy Agreement specifies that the Debtor was to receive its costs plus 50% of the attorney's fee portion of any recovery. However, the uncontradicted testimony of McCoy was that this case was not transferred to him when he left, although it is referenced in the McCoy Agreement as one that he wanted to take. McCoy testified that the firm eventually abandoned the case when it developed a conflict of interest by pursuing a defendant in the case which had been a client, and the case came back to him with the understanding the Debtor would receive only its costs for any recovery. In his letter of April 17, 1997, McCoy asserted the costs of the Debtor were $11,537.60, while the Debtor's records indicate that the costs were $11,532.31. Using the Debtor's lower figure, McCoy owes the Debtor $11,532.31 in this matter.

As to *Cole* and *Schwartz*, the Debtor argues that McCoy is obligated to pay its costs and 50% of the attorney's fee by virtue of constructive notice of its claims. McCoy testified that he received these cases not directly from the Debtor, but at least six or eight months after he resigned from Helen Parise, a former associate of the firm who had taken the cases with her. The Debtor introduced no contrary evidence or testimony. McCoy also testified that the Debtor frequently rejected cases after its investigation if it thought that the cases would be unprofitable, and he expressed his belief that this policy was employed as to these two clients. McCoy testified that when he agreed with Parise to take the cases, "[s]o far as she knew and so far as she understood, Labrum & Doak had no interest, possibly, other than costs." Trial Testimony, June 10, 1998, at 148.

The Debtor's theory for a recovery with respect to these cases is that, by reason of the McCoy Agreement, McCoy had reason to know when he subsequently obtained these two cases that the firm would seek payment for its contributions to the cases. Moreover, prior to receiving the *Cole* and *Schwartz* cases, McCoy had gotten the *Shipman* case "secondhand," although in that case the Debtor had expressly demanded only its costs. Since McCoy's most similar experience and the understanding of Parise as communicated to McCoy so closely coincide, we find that McCoy understood he would be liable to the Debtor for its costs should there be a recovery. The Debtor asserted its costs were $2,078.28 in the *Cole* matter and $2,876.27 in the *Schwartz* matter. Since apparently neither case has been tried nor settled, nothing is owed as yet, but we include

that these costs will be owed to the Debtor if there is a recovery.

We also note that, if it could be argued that these and any other cases are not covered by the McCoy Agreement, there appears to be an independent basis to render McCoy liable to the Debtor, *i.e.* under the terms of § 19.8.1 of the Partnership Agreement ("the PA"). *See LaBrum V*, at *4. McCoy's departure from the Debtor, unlike the event of dissolution, is squarely within the scope of § 19.8.1. He was clearly a partner bound by this provision. This PA provision entitles the Debtor to its accrued and unbilled costs and time charges in cases transferred to a partner by the firm on the partner's departure. We note that, when the terms of the McCoy Agreement are compared to the terms of § 19.8.1 of the PA, which would apply in the absence of the Agreement, it can be appreciated that the terms of the McCoy Agreement were very favorable to McCoy.

The total owed to the Debtor by McCoy as a result of recoveries in the *Behrens, Gorenstein, McDonough,* and *Shipman* cases is $84,005.52. Against this amount McCoy claims the right of setoff under 11 U.S.C. § 553(a) for several items, notably (1) $50,000 for the unpaid portion of his termination benefits per the McCoy Agreement; (2) approximately $30,000 for the return of capital allegedly due under the terms of the McCoy Agreement; (3) $21,332.40 for his services as liaison to the former partners; and (4) $150,000 for the Debtor's alleged failure to properly forward his mail and refer telephone calls to him.

In its reply brief, the Debtor suggests that McCoy's claims for setoff should be subject to the automatic arising from 11 U.S.C. § 362(a) and relegated entirely to the claims process. However, this Court has "consistently allowed counterclaims to be asserted defensively against debtors, if in fact the counterclaim constitutes a permissible setoff claim, pursuant to 11 U.S.C. § 553(a) or applicable state law." *In re Creative Conservation, Inc.,* 1991 WL 261706, at *2 (Bankr. E.D.Pa. Dec. 5, 1991), citing *In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 867 (Bankr.E.D.Pa.1988). "However, any attempt

to assert an affirmative cause against a debtor has been just as consistently relegated by us to the bankruptcy claims process." *Creative Conservation, supra,* 1991 WL 261706, at *2.

■ We find that McCoy's setoff of $50,000 for the unpaid portion of his termination benefits is allowable under § 553(a) without the need for a separate motion for relief from the automatic stay. The requirements for a setoff under this section are (1) a pre-petition debt owed by the creditor to the debtor; (2) a pre-petition claim of the creditor against the debtor; and (3) the mutuality or reciprocity of these obligations. *See, e.g., In re Glenn,* 207 B.R. 418, 420 (E.D.Pa.1997). McCoy is clearly owed $50,000 more under the McCoy Agreement; the Debtor did not contest that the benefits were not paid during 1997. Both of the debts arose pre-petition.

■ The Debtor nevertheless argues, first, that setoff is not appropriate because McCoy's claim as a partner is subordinate to the claims of unsecured creditors, citing *In re Marta Group, Inc.,* 53 B.R. 102 (Bankr. E.D.Pa.1985), *aff'd,* 79 B.R. 200 (E.D.Pa. 1987). However, the general rule is that subordinate claims *are* eligible for setoff. *See* 5 COLLIER ON BANKRUPTCY, ¶ 553.03[3][e][vi], at 553–45 (15th ed. rev. 1998), and cases cited therein.

■ Secondly, as to the amounts representing the last two payments, it claims that these sums should not be credited to McCoy, as they would be avoidable as preferences under 11 U.S.C. § 547. As a preliminary matter, we note that the avoidability of a setoff is properly addressed under 11 U.S.C. § 553(b), not § 547. *See Lee v. Schweiker,* 739 F.2d 870, 873 n. 4 (3d Cir.1984). More to the point, we think that this argument states a completely new and different cause of action against McCoy, in the nature of a preference claim, distinct from any claims asserted against him in the Complaint. Moreover, this new claim is untimely raised only in the last of the post-trial briefs. Consequently, we will not consider it.

McCoy's claim of an alleged violation of the McCoy Agreement "by not providing a com-

plete return of his capital contribution" is not allowable as a setoff. The basis for this claim was never proven. Furthermore, it appear to relate to the tax recapture issue regarding which we ruled against the interests of McCoy in *LaBrum, VI.*

The dispute over McCoy's claim for his services as liaison to the partners arose over the meaning of the parties' 1997 agreement that, McCoy would receive a "reasonable compensation arrangement" for his services in this regard. When McCoy submitted bills totaling $21,332.40, based on 104 hours of work at $200/hour and expenses of $532.40, Neeson reviewed the time and costs records that McCoy had submitted and agreed to pay him only $10,116.75, based on 66.2 hours at $150/hour and expenses of $186.75. The Debtor, in its post-trial reply brief, suggests splitting the difference between the two positions and expresses a willingness to allow McCoy to setoff this amount against its claims. Forcing both sides to meet halfway is often a pragmatic principle for resolving disputes. In this instance there is reason to find this amount to approximate a genuine compromise on the parties' meaning of "reasonable" compensation. Using McCoy's claim for time, 104 hours, and the Debtor's assertion that $150/hour is a more reasonable rate, the compensation would be $15,600. This figure is very close to the Debtor's proposed compromise amount of $15,724.58. We are thus convinced that, however the Debtor arrived at it, this amount represents a fair interpretation of the parties' original agreement. Consequently, we will apply $15,724.58 as a setoff against the amount that McCoy owes to the Debtor.

We find that McCoy's claim for $150,000, or any sum at all, in consideration for the Debtor's alleged interference with his phone calls and mail deliveries, has no merit whatsoever. Though not specifically invoked, McCoy's claims sounds as a claim of the tort of interference with a business relationship. *See* page 110 *infra.* We also note that, with respect to this claim, McCoy has proven no purposeful actions to harm him on the part of the Debtor and has not qualified any specific damages to himself because of the Debtor's alleged actions, rendering it extremely hard to justify finding any specific amount of damages. It would also appear to us that McCoy himself could have resolved any difficulties arising in these cases by making direct communications to the post office, the phone company, and/or his clients and other parties with whom he anticipated communications.

■ Thus, the only counterclaims or setoffs we find allowable to McCoy against the Debtor's claims in the Proceeding are the $50,000 in termination benefits and $15,724.58 for his liaison services. Deducting these amounts from McCoy's debt to the Debtor of $84,005.52, we find that McCoy presently owes the Debtor $18,280.94. In addition, he may be liable to the Debtor in *quantum meruit* for a portion of his fees ultimately recoverable in the *Jenkins* and the Debtor's costs expended therein if the *Cole* or *Schwartz* cases are successful.

3. *The Debtor's Claims Against the Ryan Firm Defendants Entitle the Debtor to Its Costs Expended in Most of the Cases and May Entitle It to Certain Fees Which We Are Unable to Liquidate on the Instant Record.*

The difficulties arising from ascertaining the merits of the Debtor's claims against the Ryan Firm Defendants can be appreciated when compared to the Debtor's claim against McCoy. There is no written termination agreement between these parties. As we noted in *LaBrum I,* at *2, at earlier junctures in the Proceeding it appeared that the Debtor was relying on the theory espoused by *Jewel v. Boxer* and its progeny, cited at page 98 *supra,* that partners of a dissolved law firm are obliged to remit to the firm all fees recovered from partnership cases which they assumed upon the dissolution of the partnership. We note that we observed, in *LaBrum V,* at *5, that the reasoning of these cases, which applies to small, solvent firms, does not appear well-suited in its applications to a large, bankrupt firm like the Debtor. Furthermore, we cannot avoid noticing that two of the four Ryan Firm Defendants, McDonnell and Gibbons, were never partners of the Debtor. Ryan had been a partner of the Debtor, but he had retired prior to disso-

lution. Brown's designation as a "non-equity partner" renders his status as a partner doubtful at best.

As the Ryan Firm Defendants point out in their brief, the Debtor appears to have abandoned the *Jewel v. Boxer* theory as a support for its claims in the Proceeding. With the departure of that theory goes any reliance on partnership principles or the invocation of any PA provisions, which are applicable only to partners, as support for the Debtor's claims.

There was testimony from Neeson that he informed Brown in particular and possibly other Ryan Firm Defendants members that an arrangement to reimburse the Debtor for its costs and fees would have to be worked out at some point after dissolution occurred. We also note that the following language appears in the text of the standard contingent-fee agreement form presented by the Debtor to at least some of its clients, which was created by Brown himself:

> 5. Withdrawal: the law Firm reserves the right to withdraw from the representation at any time, upon reasonable written notice to the Client. The Client shall also have the right to withdraw the case from the Law Firm and terminate its representation, upon reasonable written notice to the Law Firm. *In the event of a withdrawal, all costs advanced by the Law Firm shall be reimbursed fully. A reasonable fee shall be paid to the Law Firm should a recovery be subsequently made for or on behalf of the client.*
>
> 6. Fee Division: Client is aware of, and does not object to, *the division of the fee being charged the Client between the Law Firm and associate counsel,* at the Law Firm's discretion. Client shall pay no additional fee in the event of any such association. (emphasis added).

■ The denials of Brown in response to Neeson's testimony of the substance of their discussions regarding reimbursement arrangements, as well as Neeson's rather vague recitations, rule out the existence of an oral contract of any sort, which must be proven by " 'clear, precise, and convincing evidence . . .' " *LaBrum VI,* at 760, quoting

*Nicolella v. Palmer,* 432 Pa. 502, 508, 248 A.2d 20, 23 (1968).

We also find insufficient evidence to support the "contract implied in fact" theory upon which *LaBrum VI,* at 760–63, was ultimately principally decided. There is certainly some evidence, from the language of the contingency-fee agreement form if not elsewhere, that Brown and his colleagues knew or should have known that the Debtor would make some sort of claim for its costs and services expended in the cases which the Ryan Firm Defendants took. The Debtor's counsel spelled out the Debtor's demands in the meeting with Ryan Firm members held within a month from when the cases were taken. Although this meeting clearly should have preceded the reassignment of the cases in the first place, it appears to us that this meeting was conducted sufficiently soon after the reassignments that the Ryan Firm Defendants could still have reconsidered their acceptance of the cases with a minimum of unfair prejudice to that firm or the clients at that point if they disagreed with the Debtor's demands.

Our difficulty with the application of the "contract implied in fact" theory here is not, principally, that there was a lack of recognition on their part that the Ryan Firm Defendants had some liability to the Debtor. We believe that there was, or should have been, such a recognition on the part of the Ryan Firm Defendants. Rather, it is that the Debtor's proposed terms for its compensation were never made clear until the post-dissolution August meeting. Moreover, these terms, particularly the Half/Third Proposal, were clearly never agreed to by the Ryan Firm Defendants. The only implied contract at issue in *LaBrum VI* was whether the former partners of the Debtor agreed to liability to reimburse the tax recaptures, the amounts of which could be easily computed once liability was established. However, here, the measurement of the Debtor's recovery is unclear, and it is most significant to the parties' differences.

■ The Debtor is now apparently resigned to accept that the only theory on which it can assert a claim against the Ryan Firm Defendants is *quantum meruit.* The

nature of such a claim, often designated as a "quasi-contract," is thusly well-described in *Schenley, supra,* 136 F.2d at 352:

> Quasi-contractual obligations are imposed or created by law without regard to the assent of the party bound, in order not to permit unjust enrichment. They have been enforced by the courts ever since Lord Mansfield's opinion in the case of Moses v. Macferlan, 2 Burr. 1005 (K.B. 1760) ... It has thus, become the settled rule that a quasi-contract arises where the law imposes a duty upon a person, not because of any express or implied promise on his part to perform it, but even in spite of any intention he might have to the contrary. We said in *Bailis v. Reconstruction Finance Corp.*, 3 Cir., 1942, 128 F.2d 857, 859, that "Unlike true contracts, quasi contracts are not based on the apparent intention of the parties to do or to forbear doing a particular thing. A quasi contract does not arise out of a promise. See Restatement, Contracts (1932) § 5. In fact it is imposed in direct opposition to the intention of the party charged therewith. Such contracts are the means which the law has adopted to raise up obligations in order to promote justice." (footnotes omitted).

A large number of *quantum meruit* cases involve attorneys attempting to collect fees. *See, e.g., In re Hines,* 147 F.3d 1185, 1190–92 (9th Cir.1998); *Novinger v. E.I. DuPont de Nemours & Co.,* 809 F.2d 212, 218 (3d Cir. 1987); *Mulholland v. Kerns,* 822 F.Supp. 1161, 1167–69 (E.D.Pa.1993); *Eisenberg v. General Motors Acceptance Corp.,* 761 F.Supp. 20, 21–23 (E.D.Pa.1991); and *Sacerdote, supra,* 74 B.R. at 489–90. *See also* RESTATEMENT OF RESTITUTION, § 1, at 12 (1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").

The Ryan Firm, as is noted at page 99 *supra,* cites several cases for the principle that an attorney's *quantum meruit* claims lie exclusively against their former clients and not against, as here, successor counsel. While it is certainly true that all of the foregoing cases and most other *quantum meruit* actions by a discharged or withdrawn lawyer are brought against former clients

and not successor counsel, there is no intuitive reason why an action against successor counsel cannot lie. In the case of *Johnson, supra,* Judge Spaeth, speaking for the court, stated, albeit in dictum, that a *quantum meruit* action would lie where the defendant had been an associate in another attorney's law office handling a tort action for his former employer under a contingent-fee agreement. *Id.,* 254 Pa.Super. at 46–47, 385 A.2d at 517. After the defendant had been informed that his employment was being terminated, he wrote to the clients and informed them that his connection with the case would end "unless you direct otherwise." *Id.,* 254 Pa.Super. at 43, 385 A.2d at 515. Upon receiving this letter, the client wrote to the plaintiff, the former employer, discharged him, and proceeded to hire the former employee who had been handling the case. *Id.*

In response to the Debtor's citation of *Johnson* in its support, the Ryan Firm Defendants point out that more recent Superior Court decisions, *i.e., Fowkes, supra,;* and *Hugo, supra,* have emphasized that the *Johnson* court's discussion of *quantum meruit* was "pure dicta." *Hugo, supra,* 422 Pa.Super. at 271, 619 A.2d at 351. *Fowkes* explained the holding of *Hugo* to be that "an attorney, who initially represents a client and is dismissed, does not have a *quantum meruit* action against the attorney who ultimately settles the case." *Fowkes, supra,* 443 Pa.Super. at 348, 661 A.2d at 879. However, both cases are careful to emphasize that the facts of *Johnson* were very different from the cases they were deciding: "[t]he fee dispute in *Johnson* was between an employer and an employee, not unrelated attorneys as exists in this case," *Fowkes, supra,* 443 Pa.Super. at 349, 661 A.2d at 880; "the facts of Johnson are starkly different from those involved here ... [i]n contrast the instant case involves a dispute between two unrelated attorneys." *Hugo, supra,* 422 Pa.Super. at 270, 619 A.2d at 351. The other case cited by the Ryan Firm, *Hiscott, supra,* was simply an unsuccessful *quantum meruit* case brought against a client.

Thus, while Pennsylvania law is clear that a *quantum meruit* cause of action does not lie against an unrelated successor

attorney, there is no precedential bar to *quantum meruit* against successor counsel who took contingent-fee cases away from his employer at the end of their employment. *See also Reid v. Warnero*, 43 Lackawanna Jurist 104, 56 York 60 (Lackawanna Co.C.P. 1942) (sum of $56.80 in hands of successor counsel awarded to original counsel).

The facts of the instant Proceeding appear much more in line with those of *Johnson* than those of *Fowkes* and *Hugo*. There was, as is noted above, clearly an employer-employee relationship between these parties prior to the acceptance of the cases at issue by the Ryan Firm Defendants. There does not appear to have been a sufficiently-clear meeting of the minds of the parties as to establish an oral contract or even a contract implied in fact as to the terms on which these cases were accepted. However, Brown, as author of the Debtor's standard-form contingent-fee argument giving it rights to costs and a reasonable fee earned upon the Debtor's withdrawal, and his new colleagues, with whom he presumably shared his knowledge, knew or should have known that the Debtor would have some claim against new counsel regarding its services and costs dispensed to the referred clients. If there were any doubt about this point, the meeting with the Debtor's counsel in August 1997, less than a month after the cases were inherited, made at least the Debtor's position on this issue crystal clear. Also, the terms of the McCoy Agreement, negotiated by Ryan, a partner on the Ryan Firm, should have suggested to him that the Debtor would make such a claim.

Unlike the facts of *Fowkes, supra,* 443 Pa.Super. at 346–47, 661 A.2d at 878–79; and *Hugo, supra,* 422 Pa.Super. at 265–66, 619 A.2d at 348–49, the clients in issue did not, except in the case of Dixon, dismiss the Debtor as their counsel as the result of the client's dissatisfaction with the Debtor and seek out the replacement counsel. Rather, the Debtor handed the clients and their files over to the successor counsel, typically to the same lawyer who had been representing the client earlier as an employee of the Debtor. While it is true that the Ryan Firm's acceptance of client files served a benefit to the Debtor in not having to search out alternative competent replacement counsel, there is little doubt that receipt of a ready-made client file, initially likely to have been acquired by the Debtor through its own good reputation, served a significant benefit to the Ryan Firm Defendants as well. It would be, in our view, unjust to allow the Ryan Firm Defendants to accept that benefit without compensating the Debtor for same. This is especially so when it is recalled that the costs and services of the Debtor had often been performed by Brown or another Ryan Firm attorney who served the same client in the capacity of an employee of the Debtor, and hence presumably performed work that was competently done and useful to the case.

In the face of such a significant body of cases transferred to the Ryan Firm Defendants, as opposed to the referral of a single case as were at issue in *Fowkes* and *Hugo* and many of the other cases cited, it hardly appears unexpected or unjust for the Debtor to proceed against replacement counsel in all cases to which the defendants succeeded rather than pursuing each individual client in each case. In light of all of the foregoing, we conclude that a failure to grant any relief to the Debtor, without compensation for costs expended or services which in fact did benefit the successful resolution of a case, would allow the Ryan Firm Defendants to become unjustly enriched at the Debtor's expense. Therefore, *quantum meruit* relief in some measure can clearly be appropriately awarded against the Ryan Firm Defendants.

The Ryan Firm Defendants further argue that, if *quantum meruit* could be justified, the Debtor has failed to prove the elements of the alleged ten-factor test employed in *Paul, supra,* 1996 WL 297572, at *8, citing *Mulholland, supra,* 822 F.Supp. at 1169; and *In re LaRocca's Trust Estate*, 431 Pa. 542, 546, 246 A.2d 337, 339 (1968), *i.e.,*

> (1) the amount of work performed; (2) the character of the services rendered; (3) the difficulty of the problems involved; (4) the importance of the litigation; (5) the amount of money or value of the property in question; (6) the degree of responsibility incurred; (7) whether the fund involved was created by the attorney; (8) the pro-

fessional skill and standing of the attorney in his profession; (9) the results he was able to obtain; and (10) the ability of the client to pay a reasonable fee for the services rendered.

They also point out that there is no evidence, applying the ten-factor test or otherwise, to support the Half/Third Proposal which the Debtor contends is a preferable across-the-board resolution of the problem of measuring the value of its services in all cases taken by the defendants.

█ We agree with the Ryan Firm Defendants that the record does not support the imposition of the Half/Third Proposal's across-the-board formula where its application is not consensual. We also agree that the Debtor did not present the type of fact-specific evidence under the ten-factor test that was enunciate in *Paul, supra.* This deficiency is understandable when it is considered that the Debtor has dissolved and the attorneys who worked on the case at issue were usually the defendants themselves or at best associates who scattered when the firm dissolved. It will be necessary for the Debtor to present further evidence to support its *quantum meruit* claims. We remind the Debtor that mere records of services performed and costs expended does not support a *quantum meruit* recovery. *See Mulhol-*

*land, supra,* 822 F.Supp. at 1169; and *Agresta v. Sambor,* 1994 WL 70347, at *1–*2 (E.D.Pa. March 1, 1994). In all probability the Debtor can succeed only by presenting expert testimony that it services and costs benefitted the Ryan firm Defendants in some quantified amount.

However, we are inclined to give the Debtor that opportunity. We note that the relief which the Debtor sought in the Complaint, was, as we found in *LaBrum II,* at *4, only limited and basically equitable: a declaration of their rights, an injunction to prevent the transfer of fees deemed recoverable, an accounting, and a basis for determining the fees and costs payable to the Debtor. The Debtor did not necessarily insist on an immediate liquidation of all of its claims.

At this point, we believe that it is helpful to analyze each of the cases taken by the Ryan Firm Defendants which are at issue. As it turns out, there are only nineteen (19) such cases, and many can be summarily resolved at this point. We can then direct the parties, focus on only those cases which demand further consideration. We believe that will be helpful to list them on the following chart, thereby furthering their ready comparison and categorization:

| No. | Client | Status | Debtor Hours | Debtor Costs | Comments |
|---|---|---|---|---|---|
| 1. | Smith | lost at trial, on appeal | 1998.3 | $66,736.97 | no claim unless appeal succeeds |
| 2. | Williams | settled for $135,-000; fee $45,000 | 528.5 | $9504.95 | |
| 3. | Waxler | settled for $60,-000 | 410.3 | $16,994.82 | clients related to Defendant STEPHEN J. SPRINGER |
| 4. | Bielum | Won over $3 million, only $1 million covered by insurance | 322.0 | $5842.85 | |
| 5. | Keller | settled for $70,-000 | 567.0 | $9244.84 | |
| 6. | Burke | settled for $144,-000 | 201.9 | $870.34 | claim pursued by Debtor allegedly |

| No. | Client | Status | Debtor Hours | Debtor Costs | Comments |
|---|---|---|---|---|---|
| | | | | | different than claim settled; if so, only costs should go to Debtor |
| 7. | White | settled for $8500 | 95.7 | $36.51 | client was a former Debtor's secretary: Brown convincingly testified that this case was taken as a personal accommodation to plaintiff; in light of this and the small recovery, only costs seem appropriately awarded to Debtor. |
| 8. | Saracini | settled, apparently for $190,000 | 901.2 | $15,901.27 | case in which Longo asserts a referral fee |
| 9. | Keck | still in discovery | 142.6 | $968.16 | premature for resolution, but Debtor's claim should be modest. |
| 10. | Kuzma | arbitration 7/3/98: outcome? | 199.3 | $7,085.31 | premature, at least with the outcome of the arbitration is known. |
| 11. | Givnish | "partially settled," amount unclear, liability policy only $15,000 | 109.8 | $501.32 | recovery appears modest, only costs seem warranted |
| 12. | Durham | vaccine case handled by McDonnell; no resolution indicated | 131.8 | $5995.03 | premature for resolution |
| 13. | DeRobertis | vaccine case handled by McDonnell; no resolution indicated | 75.8 | $2068.43 | premature for resolution |
| 14. | Colluro | vaccine case handled by McDonnell; no resolution indicated | 47.2 | $954.96 | premature for resolution |
| 15. | Maguire | settled for $65,000 | 653.0 | $11,336.32 | |
| 16. | Pero | still in discovery | 611.6 | $8,628.83 | premature |
| 17. | Brett | lost at trial, no appeal | 323.3 | $4,681.79 | no claim |

| No. | Client | Status | Debtor Hours | Debtor Costs | Comments |
|---|---|---|---|---|---|
| 18. | Creative Copier, Dixon | uncertain | 4,264 | $59,773.28 | Testimony of client dissatisfaction with Debtor; it appears that Debtor voluntarily withdrew from case without any provision for recovery; probably no claim except costs is justified |
| 19. | Fertel | settled for $45,-000; fee $15,000 | 143.6 | $439.57 | |

Our analyses of the Debtor's rights in the foregoing cases, by reference to the case numbers utilized in the chart, are as follows. No recovery appears justified in 1 and 17. The circumstances of 6, 7, 11, and 18 appear to justify no more than recovery of costs by the Debtor. Resolutions of 9, 10, 12, 13, 14 and 16 appear impossible at this time because the ultimate resolutions of the underlying cases have not been attained. We note that, as a result, these matters could not, in any event, be resolved at this time. The modest settlement of 3 appears to justify nothing more than a recovery of its costs by the Debtor. The only matters which could be resolved presently on the basis of additional evidence therefore appear to be 2, 4, 5, 15, 19, and possibly 8.

The foregoing analyses are only preliminary assessments. We believe that the best way to handle the final liquidation process is for the Debtor to designate the cases on which it wishes to present further evidence and make claims. Also, there will be certain cases which can be designated for resolution only when the underlying cases are resolved. We will direct the Debtor to make the designations for present and future resolution on or before September 4, 1998. A hearing is thereafter scheduled to receive additional evidence relative to the cases designated on September 16, 1998. We are of course hopeful that the parties can resolve at least the smaller matters, *e.g.*, 5, 15, and 19, without the necessity for a hearing.

4. *Miscellaneous Matters: The Ryan Firm Defendants' Counterclaims Will Be Denied and We Hold that Longo's Referral Claim Is Valid But Can Only Be Realized Upon Final Resolution of the Saracino case.*

The Ryan Firm Defendants assert four counterclaims in their Answer to the Complaint, several of which we held, in *LaBrum II*, at *3, had the effect of contributing to the waiver of their right to a jury trial. All but the second arose from the Debtor's now-retracted entries of charging liens against the Ryan Firm's cases. The first, seeking a declaratory order that the charging liens are invalid, appears moot by reason of the effectuation of the resolution proposed in *LaBrum II*, at *1, which was ultimately accepted. The third and fourth seek damages for tortuous interference with business relationships and wrongful use of civil process in connection with the imposition of the liens. The second claim seeks "recovery" of a $12,138 payment which Allstate submitted to the Debtor as an advance for services ultimately allegedly performed by the Ryan Firm.

Consistent with our statements at page 102 *supra*, regarding McCoy's counterclaims, we would allow the Ryan Firm Defendants to set off any of its Counterclaims found to be valid

against the Debtor's claims against it. However, claims which exceeded the amount of the Debtor's claims would have to be relegated to the claims process.

The claim regarding Allstate's payments makes no sense to us. As the Debtor points out, this claim asserts a cause of action on behalf of Allstate only. There is no basis whatsoever on which we could order the Debtor to remit these funds to the Ryan Firm, even if we held, as was alleged by the Ryan Firm Defendants, but not proven, that they represented an overpayment.

■ The elements of tortious interference with a business relationship are set forth in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998), as follows:

(1) the existence of a contractual, or prospective contractual relation between itself and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring;

(3) the absence of a privilege or justification on the defendant;

(4) the occasioning of actual legal damage as a result of the defendants' conduct; and

(5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant; *Pelagatti v. Cohen,* [370 Pa.Super. 422], 536 A.2d 1337, 1343 (Pa.Super.1988); *see also Thompson Coal Co. v. Pike Coal Co.,* [488 Pa. 198], 412 A.2d 466, 471 (Pa.1979); *Birl v. Philadelphia Elec. Co.,* [402 Pa. 297], 167 A.2d 472, 474 (Pa. 1960).

■ The elements of the tort of wrongful use of civil process, under Pennsylvania law, are thusly articulated in *Aamco Transmissions, Inc. v. Graham,* 1990 WL 55675, at *2 (E.D.Pa. April 26, 1990):

1. The defendant has procured, initiated or continued the civil proceedings against him.

2. The proceedings were terminated in his favor.

3. The defendant did not have probable cause for his action.

4. The primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.

5. The plaintiff has suffered damages.

*See also, e.g., Jennings v. Shuman,* 567 F.2d 1213, 1218–19 (3d Cir.1977); and *American Int'l Airways, Inc. v. American Int'l Group, Inc.,* 816 F.Supp. 1058, 1061 (E.D.Pa.1993), construing 42 Pa.C.S. §§ 8351–54.

■ The elements of "purposeful action ... intending to harm" and improper primary purpose, respectively, required to establish these respective torts, and the requisite evidence of specific damages have not been proven by the Ryan Firm Defendants. Our holding that the Ryan Firm Defendants unjustifiably refused to agree to pay *any* costs or fees to the Debtor rendered the Debtor's actions to enter the charging liens justifiable, if not necessarily meritorious. Evidence of the Debtor's lack of malicious intent was indicated by its willingness to remove the liens under the basis set forth in *LaBrum II.*

Finally, the status of Longo's claim for referral fees must be briefly addressed. The Debtor apparently makes no claim against him, but simply included him as a defendant to harmonize his claims to a one-third referral fee out of the fee recovered in the *Saracino* case with its own claims. Brown appeared to contest Longo's referral-fee claim, but presented no principled argument to support this position. It therefore appears that Longo has a valid one-third referral-fee claim. The amount of his entitlement can possibly be computed if the *Saracino* case settlement is completed. The resolution of this claim is also carried along to September 16, 1998.

## D. CONCLUSION

An order effectuating the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 14th day of August, 1998, after the trial of the above-captioned proceeding on June 8, June 9, June 10, and June 11, 1998, and upon consideration of the parties' post-trial submissions, it is hereby OR-DERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtor, LABRUM & DOAK, LLP ("the Debtor"), against Defendant EDWIN F. McCOY, ESQUIRE ("McCoy"), in the amount of $18,280.94, plus possible *quantum meruit* recoveries on the uncompleted *Jenkins, Cole,* and *Schwartz* cases handled by McCoy, as indicated in the within Opinion.

2. Judgment is entered in part in favor of the Debtor and against Defendants JOHN R. BROWN, ESQUIRE, PATRICK GIBBONS, ESQUIRE, MICHAEL T. McDONNELL, ESQUIRE, DANIEL RYAN, ESQUIRE, and RYAN BROWN McDONNELL BERGER & GIBBONS (collectively "the Ryan Firm Defendants").

3. It is DECLARED that the Ryan Firm Defendants may be liable to the Debtor for costs and attorneys' fees expended on certain of the contingency-fee cases of the Debtor handled by the Ryan Firm Defendants on a *quantum meruit* basis.

4. The Debtor shall designate in writing to counsel for the Ryan Firm Defendants, the two Official Committees appointed in this case, and the court in chambers all cases handled by the Ryan Firm Defendants regarding which it wishes to present further evidence in support of its *quantum meruit* claims on or before September 4, 1998.

5. Judgment is entered in favor of the Debtor and against McCoy and the Ryan Firm Defendants on their respective Counterclaims except to the extent that the judgment in paragraph one allows certain setoffs to McCoy.

6. It is DECLARED that Defendant WILLIAM LONGO, ESQUIRE ("Longo"), has a valid claim to a referral fee for one-third of the total fees recovered by all counsel in representation of Melissa Saracino.

7. A hearing on any claim designated by the Debtor in paragraph four *supra;* and a status hearing on Longo's claim and any other outstanding matters relative to this proceeding are scheduled on

WEDNESDAY, SEPTEMBER 16, 1998 AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.