## Mongeluzzi v. Pansini & Lessin

*Howard D. Scher,* for plaintiff.
*Philip G. Kircher,* for defendant.

JONES II, *J.,* December 10, 2001—

## I. INTRODUCTION

This is a dispute between two law firms over the division of $6 million in attorneys' fees generated by the settlement of three lawsuits that were filed against PECO Energy Company in the wake of a December 1995 gas explosion in Norristown, Pennsylvania. Plaintiffs Robert Mongeluzzi and Saltz Mongeluzzi Barrett & Bendesky, bring this action for unjust enrichment, and seek an accounting and the imposition of a constructive trust to recover their share of the fees received by defendants as generated by the PECO actions. Plaintiff Robert Mongeluzzi claims that he prepared a letter dated February 22, 1999, to confirm an oral "agreement to agree," *not a contract,* reached at a meeting on February 16, 1999 regarding the division of counsel fees, and that the letter defers agreement on that division until the cases were resolved.

Defendants Pansini & Lessin, Michael O. Pansini and Jeffrey R. Lessin, claim that they reached an enforceable *oral contract* with plaintiff Mongeluzzi at that same meeting of February 16, 1999, and that plaintiff Mongeluzzi's letter of February 22, 1999 was a written confirmation of some of the terms of the contract.

The critical issues presented are: (1) whether a contract exists. If so, all parties agree that plaintiffs' action must be dismissed and judgment entered for defendants; (2) if a contract does not exist, whether plaintiffs are entitled to compensation based upon an hourly rate, or a percentage of the total sum of attorneys' fees collected

by the defendants, or an amount based upon "the value of the plaintiffs' services."

## II. PROCEDURAL HISTORY

On October 4, 2001, upon consideration of plaintiffs' motion to strike defendants' jury demand, and the withdrawal of opposition thereto by the defendants, this court issued an order granting plaintiffs' motion, and also ordered that all motions in limine currently held under advisement by this court were denied as drafted, however the substance of each motion would be addressed at the time of trial, which was scheduled for Tuesday, October 9, 2001. See order dated October 4, 2001. Plaintiffs were permitted to withdraw their contract, conversion, and replevin claims at law, and were permitted to proceed in equity. Plaintiffs concede that a finding that a contract exists would preclude recovery by them in this action. However, plaintiffs argue that a contract does not exist, and therefore request this court to order: (1) a constructive trust, (2) an accounting, and (3) a monetary award predicated on their claim of unjust enrichment (quantum meruit). N.T. 10/2/01, pp. 39-40, 42, 48, 56-57, 58-59.

The defendants seek a dismissal of plaintiffs' claim based upon the following: (1) a contract exists, and that the existence of an enforceable contract precludes recovery under an unjust enrichment theory; (2) plaintiff Mongeluzzi is equitably estopped from denying that he should be paid for his time; (3) plaintiff Mongeluzzi's "impact evidence," meaning the impact his presence had upon the increase in the settlement value of the case, was speculative at best; (4) evidence of the "value of services" of plaintiff Mongeluzzi was insufficient; (5)

plaintiff Mongeluzzi is limited to participating—if he is allowed to participate at all—only in the settlement proceeds of the Keysers, because they are the only parties for whom he entered an appearance; and, (6) plaintiff Mongeluzzi cannot seek the equitable relief he has requested because he has unclean hands.

Before trial, defendants moved in limine, inter alia, to preclude PECO's counsel, William J. O'Brien or the mediator, former Judge David Murphy, from expressing any view on the "impact" of plaintiff Mongeluzzi on the settlement of the underlying PECO cases. This court ruled that it would not hear any "impact" evidence "unless a member of counsel who negotiated with or against Mr. Mongeluzzi is going to testify in this case . . . unless the person or persons testified, it would not be admissible evidence." N.T. 10/12/01 (a.m.), pp. 7-8. This court precluded the testimony of Bernard Smalley, Esquire regarding purported unethical conduct by the defendant Michael O. Pansini. *Id.* at 8. This court ruled that evidence of the value of services provided by plaintiffs was properly admissible at trial. *Id.* at 8. Last, this court ruled that the mediation privilege[1] precludes evidence of communications made during and related to, mediations. Therefore, such evidence would not be admissible at the trial. N.T. 10/12/01(p.m.), pp. 64-67.

### III. FINDINGS OF FACT

(1) Defendants Pansini, Lessin, and Mezrow are personal injury attorneys. Defendant Pansini & Lessin is a partnership engaged in the practice of personal injury

---

1. See 42 Pa.C.S. §5949.

law. In February 1997, just before filing suit in the *Costello/Keyser* action, Pansini & Lessin hired a third, non-equity attorney, defendant Steven Mezrow. See N.T. 10/29/01 (a.m.), pp. 114-15; N.T. 11/14/01 (p.m.), p. 4.

(2) Norristown, Pennsylvania firemen James Costello and Craig Keyser, and Norristown resident Irvin Byrd, retained Pansini & Lessin to represent them in connection with the injuries they sustained in the Norristown explosion under written contingency fee agreements. These agreements entitled defendants to 40 percent of any recovery obtained by suit or post-litigation settlement, as well as "all costs and expenses incidental to any litigation or negotiation of settlement." The agreements did not cover compensation for any potential appeals. See plaintiffs' proposed finding of fact and conclusions of law, exhibits 153, 154, 155.[2]

(3) In April 1997, James Costello and Craig Keyser filed suit in Philadelphia County against PECO. Venue in that particular action was subsequently transferred to Montgomery County.[3] In August 1997, Irvin Byrd, a Norristown resident, also filed suit in Philadelphia County against PECO. In December 1997, Louise Byrd

---

2. Defendants also represented Kathryn Costello, Joleen Keyser, and Louise Byrd, however no written fee agreements with those PECO action plaintiffs were identified or introduced at trial.

3. PECO moved to have both the *Costello/Keyser* and *Byrd* cases transferred out of Philadelphia County. N.T. 10/23/01 (a.m.), pp. 5, 21-22. The *Costello/Keyser* case was transferred to Montgomery County in August 1997, where it remained, while the *Byrd* case was transferred to Montgomery County in November 1997 but, on appeal, transferred back to Philadelphia County in November 1998. See N.T. 10/23/01 (a.m.), pp. 22-23; defendants' proposed findings of fact and post-trial brief, exhibit 105.

(Irvin Byrd's mother) and Irvin Byrd filed suit against PECO in Federal District Court for the Eastern District of Pennsylvania. N.T. 10/23/01 (a.m.), pp. 3-5. In August 1998, James Costello, Craig Keyser and the Byrds, as well as several police and firefighter organizations, petitioned the Pennsylvania Public Utility Commission in connection with a prior PUC proceeding involving PECO. N.T. 10/23/01 (a.m.), p. 35.[4]

(4) During the course of the PECO actions, Pansini & Lessin retained several other attorneys to assist with the prosecution of those cases. In each case, defendants chose these third-party counsel on the basis of their ability to lend their legal expertise or personal reputation and credibility to defendants' efforts. William J. O'Brien, Esquire and Howard Kline, Esquire are attorneys and members of the law firm retained by PECO to represent its interests in the PECO actions, and other matters.[5]

(5) In December 1997, defendants hired Frank Finch, Esquire, a civil rights practitioner, because they needed someone to draft the federal civil rights complaint and

4. Formally, these cases were: *James Costello, Kathryn Costello h/w, Craig Keyser and Joleen Keyser h/w v. PECO Energy Co.,* Montgomery County Court of Common Pleas no. 97-16224 (the *"Costello/ Keyser"* case); *Irvin Byrd v. PECO Energy Co.,* Philadelphia County Court of Common Pleas, August Term 1997, no. 3517 (the *"Irvin Byrd"* case); and *Irvin Byrd and Louise Byrd v. PECO Energy Company,* United States District Court, Eastern District of Pennsylvania, no. 97-CV-7892 (the "federal civil rights" case) (collectively referred to as the "PECO actions," "PECO plaintiffs," and "PECO defendants").

5. PECO was initially represented in the PECO plaintiffs' actions by Bruce Kauffman and Carl Hanzelik of the Dilworth Paxson law firm. In mid-October 1997, Bruce Kauffman and Carl Hanzelik were replaced as PECO's counsel by William J. O'Brien and Howard Klein of the Conrad O'Brien law firm.

assist with the claim on behalf of the Byrds. Defendants do not practice civil rights law, and needed to retain someone who was familiar with that field. Defendant Mezrow recommended Finch to Pansini & Lessin because he knew that Finch had developed an "expertise" in that area, and indeed "that's his specialty." N.T. 11/14/01 (p.m.), pp. 38-39.

(6) Defendants entered into a written agreement with Finch whereby he was hired as an "independent contractor," and was asked to prepare a "professionally drafted" civil rights complaint on behalf of the Byrds. Finch's request for payment, based upon a percentage of the recovery, was specifically rejected by defendants. N.T. 10/23/01 (a.m.), p. 29. The retainer letter provided that Finch would receive an initial retainer of $350, and ongoing payments at a rate of $95 per hour. Finch submitted regular monthly bills in accordance with this written contract, detailing his time spent on the case, and received periodic payments in accordance with his bills. See defendants' proposed findings and post-trial brief, exhibit 108.

(7) Between December 1997, when he was first retained, and March 1999, when the PECO actions settled, Finch worked a total of 32.8 hours on the federal civil rights action, and was paid a total of $3,124. See defendants' proposed findings and post-trial brief, exhibit 108. Finch was never asked to work on any matter other than the federal civil rights case, nor did he participate in any mediation or settlement negotiations.

(8) On November 25,1998, defendants also retained Arlin Adams, Esquire, a former member of the United States Court of Appeals for the Third Circuit, to give

them legal advice regarding punitive damages and the applicability of the "Fireman's Rule" to the PECO actions. See plaintiffs' proposed finding of fact and conclusions of law, exhibit 16. In a letter dated November 25, 1998, Adams wrote to defendants outlining: the nature of assistance defendants were seeking from him regarding punitive damages and the Firemen's Act; the details of a retainer fee; and the nature of how he would charge for his services, including the fact that *Adams was going to charge hourly rates for his services.* See plaintiffs' proposed finding of fact and conclusions of law, exhibit 16. (emphasis added) Defendants sent a letter in response thereto, indicating that they had signed Judge Adams' letter of November 25, 1998 *and also enclosed an initialed copy of same,* indicating a clear meeting of the minds as to performance and payment. See defendants' proposed findings and post-trial brief, p. 85; N.T. 10/22/01 (p.m.), pp. 34-36. *This was not done by defendants in response to plaintiff Mongeluzzi's letter of February 22, 1999.* Defendants hired Adams because they wanted "someone we respected" to give them an opinion on the validity of several defenses to punitive damages that PECO had raised. N.T. 10/23/01 (p.m.), pp. 45-48. Defendant Pansini knew Adams both by his reputation and from having hired him on a previous occasion as an expert witness. *Id.*[6]

(9) Under their written fee agreement with Adams, defendants agreed to pay him at his "regular hourly rate"

---

6. Defendant Pansini ultimately terminated the relationship with Adams, as Pansini was displeased with two to three of Adams' unauthorized and counter-productive actions. N.T. 10/16/01 (a.m.), p. 97; N.T. 10/22/01 (p.m.), pp. 78-79.

of $385 per hour, plus time spent by his associates and paralegals at their "regular hourly rates." Adams also requested and obtained a retainer of $7,500 to be credited against fees accrued. See plaintiffs' proposed finding of fact and conclusions of law, exhibit 16.

(10) In addition to legal research, defendants asked Adams to lend his personal credibility to their settlement demands, which PECO counsel Bill O'Brien clearly considered excessive and unwarranted. Defendants asked Adams to verify that defendants' settlement demand, which at that time was $27.5 million, was credible given the facts of the case. Defendants chose Adams for this task because Adams was a "legend" who "had been around a long time" and, unlike defendants, had experience in large cases such as the *Exxon Valdez* lawsuits. N.T. 10/23/01 (p.m.), pp. 47-48, 56-57.

(11) Defendants hired Adams because they needed an "expert" "with some credibility" who could talk to O'Brien about the gravity of the case, and convince him that the PECO actions could result in a large punitive damages award that would not be reversed or reduced on appeal. N.T. 10/29/01 (a.m.), p. 17.

(12) The professional relationship between PECO counsel William J. O'Brien and defendants was contentious, offensive, and by acknowledgment of both during the instant trial, at times, wholly unprofessional and devoid of decorum and respect. O'Brien found defendants' tactics inappropriate, counterproductive, and frustrating, and that they did nothing to advance the PECO actions towards either trial or settlement. N.T. 10/15/01(p.m.), pp. 19-20; N.T. 10/12/01 (p.m.), pp. 36-40. Defendant Pansini complained that O'Brien had been inconsistent

in his approach to settlement, sometimes seeming interested in settling, while at other times refusing to speak to defendant Pansini regarding the issue.[7]

(13) PECO counsel O'Brien preferred speaking with Adams rather than Pansini because he knew and respected Adams from having dealt with him in the past, and believed that Adams was a lawyer with whom he could "talk sense" about the case. N.T. 10/12/01 (p.m.), p. 72.

(14) PECO's strategy in the PECO actions was to obstruct and delay the PECO plaintiffs' (defendants') discovery efforts. The defendants resisted this strategy by filing appropriate motions, responses, and engaging in in-court representation at all phases. However, defendant also employed many questionable tactics, including a press release regarding PECO president and CEO, Corbin A. McNeill Jr.'s pending deposition.[8]

(15) The discovery process was also rife with discord and cross-allegations of noncompliance, discovery abuses

---

7. On December 23, 1997, PECO offered to settle all claims in the PECO actions for a total of $885,000. Defendant Pansini rejected the offer, telling O'Brien "I'm sure you know what PECO can do with the offers made," and that "everything from hereon in is on [PECO]." See plaintiffs' proposed finding of fact and conclusions of law, exhibits 7, 8.

8. The press release closed with the following comment:

"It is interesting to note that Mr. McNeill's deposition will take place as President Clinton's trial in the Senate is set to begin. President Clinton is accused of having committed perjury by lying under oath at his civil deposition in the Paula Jones case when he denied having sexual relations with Monica Lewinsky. With that backdrop, Mr. McNeill's deposition will be closely scrutinized for any perjurious statements after the close of his deposition on Wednesday, January 13, 1999." See plaintiffs' proposed finding of fact and conclusions of law, exhibit 23.

and unethical conduct. After months of disagreements and lack of compliance with discovery requests, on August 7, 1998, the Pansini firm filed a motion seeking to compel certain discovery and also seeking sanctions for PECO's bad faith in making its discovery responses. N.T. 10/15/01 (p.m.), p. 111. See also, defendants' proposed findings and post-trial brief, exhibits 135, 150. This motion was assigned in November of 1998 to a special discovery master, David Deardon, Esquire who was a Montgomery County lawyer. Mr. Deardon invited written submissions respecting this motion and he also conducted telephone conferences to hear argument of counsel. N.T. 10/15/01 (p.m.), p. 111. On December 24, 1998, Mr. Deardon submitted a lengthy report and recommendation to Judge William R. Carpenter of the Montgomery County Court of Common Pleas.[9]

(16) Defendants made their initial settlement demand in June 1997, less than 60 days after filing the complaint in the *Costello/Keyser* action. In a letter to Carl Hanzelik, Esquire, who represented PECO at the time, defendants demanded $25 million to settle the *Costello/Keyser* cases. See plaintiffs' proposed finding of fact and conclusions of law, exhibit 158.

---

9. Judge Carpenter adopted the recommendation of the discovery master concerning PECO's response to defendants' "extraordinary" number of interrogatories, and their subsequent eight-month refusal to review PECO's documents. This order noted that:

"To a very real degree, the plaintiffs [sic] excessive zeal has interfered with the very discovery that they sought. This should not be blamed on the defendant. The plaintiffs have set the tone in this litigation and they must take affirmative steps to return the process to a cordial basis so that amicable discovery can take place."

(17) Hanzelik and PECO refused to respond to this demand, stating in a September 1997 case management conference memorandum that "[p]laintiffs' demand is so excessive that no offer has been made." See plaintiffs' proposed finding of fact and conclusions of law, exhibit 158.

(18) Defendants withdrew their $25 million demand in October 1997. On November 6, 1997, they increased the demand to $50 million. See plaintiffs' proposed finding of fact and conclusions of law, exhibit 1.

(19) On December 23, 1997, PECO offered to settle all claims in the PECO actions for a total of $885,000. Defendant Pansini rejected the offer.

(20) The parties held a mediated settlement conference in February 1998. While defendants' offer remained at $50 million, PECO raised its settlement offer to $2.6 million. Defendants rejected this offer. Plaintiffs' proposed finding of fact and conclusions of law, exhibits 10, 11.

(21) Defendants reduced their demand in the PECO actions to $27.5 million on May 5, 1998. Plaintiffs' proposed finding of fact and conclusions of law, exhibit 12.

(22) Defendant Pansini threatened to hire James Beasley, Esquire during a 1998 conversation with O'Brien. N.T. 10/12/01 (p.m.), pp. 47-48, 54-55. Defendant Pansini told O'Brien that the settlement demand would go up in the PECO cases if he brought Beasley on board, because Pansini would "have to pay him [Beasley] a referral fee." N.T. 10/23/01 (p.m.), pp. 22-24; N.T. 10/12/01 (p.m.), pp. 54-55. Defendant Pansini testified that he chose to invoke Beasley, not because of his reputation and famous

successes in the courtroom, but rather because he was an older attorney and a member of O'Brien's generation. N.T. 10/23/01 (p.m.), p. 24.

(23) By January 1999, defendants had invested enormous amounts of time, talent, and energy (albeit some of which were inappropriate stimuli and responses) in the prosecution of the PECO actions.[10] However, defendants were unable to move forward in the negotiation process.

(24) On February 11, 1999 Judge Carpenter issued, inter alia, an order setting the close of discovery for June 1, 1999. See plaintiffs' proposed finding of fact and conclusions of law, exhibit 165. At that point, defendants had not yet taken any depositions.

(25) Plaintiff Mongeluzzi was brought into the case as a result of a meeting between plaintiff Mongeluzzi and defendants Pansini and Lessin in Mongeluzzi's office on February 16, 1999. Defendants requested plaintiff Mongeluzzi to assist with the PECO actions, but only in the limited role of a "catalyst" to help bring PECO's attorneys back to the settlement table after talks had broken off in December 1998.[11]

(26) Defendants Lessin and Pansini went together to plaintiff Mongeluzzi's office to meet with him and discuss the PECO cases and Mr. Mongeluzzi's involvement

---

10. Defendants have offered that they expended between 3,000 and 4,000 hours to prosecute the PECO actions from beginning to end.

11. As to what defendant Pansini's understanding was if the matters did not settle as he anticipated, defendant Pansini opined that plaintiff Mongeluzzi would be handling the cases on behalf of Keyser and as co-counsel to the Byrds, which would include depositions and trial. N.T. 10/16/01 (p.m.), p. 3.

in them. Defendant Pansini explained to plaintiff Mongeluzzi the history of the cases and the detailed background of them, the *Cognato*[12] settlements, the recent settlement discussions including the December 11, 1998 mediation, the Adams-O'Brien discussions involving settlement overtures of $10.5-$12.6 million, and where Pansini believed PECO was regarding settlement. Mr. Pansini explained to Mr. Mongeluzzi his expectation that these cases would settle upon a second day of mediation taking place. His plan was to have another attorney, Mr. Mongeluzzi, send a letter to Bill O'Brien, drafted by the Pansini firm, yet written on Mongeluzzi's firm's letterhead, threatening a substantial number of PECO depositions to occur in the next several months, beginning with the deposition of Corbin McNeill. Mr. Pansini explained his expectation that, in response to this letter, Mr. O'Brien would almost certainly ask to resume the Murphy mediation. N.T. 10/23/01 (p.m.), pp. 102-15.

(27) Plaintiffs and defendants disagree diametrically as to the substance, if any, of the February 16, 1999 meeting regarding payment of fees in exchange for plaintiffs' participation in the requested representation. They also disagree as to whether there was an understanding as to whether plaintiffs would be compensated for some or all of the individual PECO plaintiffs' settlement award.

(28) Plaintiffs and defendants agree that plaintiff Mongeluzzi sent defendants a letter dated February 22, 1999 relating to the conversations of February 16, 1999.

---

12. This name was given to a separate set of plaintiffs involved in a separate lawsuit against PECO as a result of the same explosion which injured the PECO plaintiffs. Neither instant plaintiffs nor defendants were involved in those matters.

See plaintiffs' proposed finding of fact and conclusions of law, exhibit 29-A. See also, defendants' proposed findings and post-trial brief, exhibit 1. However, the parties cannot agree to what the letter means.

(29) Defendants believe that the meeting of February 16, 1999 produced a valid contract between the two, and that the writing of February 22, 1999 further articulated that a contract had been struck.

(30) Plaintiffs believe that no contract was ever formed between the parties, but instead, there was simply an agreement to agree on the division of fees at the conclusion of the PECO actions.

(31) Plaintiff Mongeluzzi invested, in his estimation, between 15 and 30 hours of time in participating in the case. See deposition of Robert J. Mongeluzzi, 12/20/00, p. 38. Plaintiff Mongeluzzi's participation (value of services) included the use of his name and firm's letterhead on certain written communications, as well as their content to PECO's counsel William J. O'Brien.[13]

(32) On February 19, 1999, defendants delivered to plaintiff a draft letter to be sent to PECO counsel O'Brien. The draft letter stated that as many as 107 depositions would be taken of PECO and former PECO personnel. In addition, defendants supplied a statement of facts for

---

13. In a letter dated February 19, 1999 from defendant Pansini to plaintiff Mongeluzzi, defendant states, inter alia: "I would very much appreciate *a letter to Bill O'Brien* indicating that *you* are trial counsel in this matter and that *you* would like to begin depositions immediately. . . . I ask that *you emphasize* that they will get Jim Costello's deposition as soon as the court ordered deposition of Corbin McNeill is completed." Plaintiffs' proposed findings of fact and conclusions of law, exhibit 28-A. (emphasis added)

68

plaintiff Mongeluzzi's use so that he would have a rudimentary knowledge of the cases when contacted by O'Brien. N.T. 10/18/01 (a.m.), pp. 71-72;10/24/01 (a.m.), pp. 20-26, 43-46. See also, defendants' proposed findings and post-trial brief, exhibit 4. On February 22,1999, Mr. Mongeluzzi returned the draft letter with one substantive change. As instructed by Pansini, Mr. Mongeluzzi sent the letter that day to PECO's counsel, O'Brien. N.T. 10/18/01 (p.m.), pp. 89-91.

(33) After plaintiff Mongeluzzi began his involvement, a meeting was arranged wherein all counsel in the PECO action would meet. N.T. 10/12/01 (p.m.), p. 94. On March 8, 1999, prior to all counsel appearing together, plaintiff Mongeluzzi met alone with PECO counsel, William J. O'Brien, at the request of O'Brien. N.T. 10/18/00 (p.m.), pp. 4-5.

(34) At the March 8, 1999 meeting between plaintiff Mongeluzzi and O'Brien, there were no settlement negotiations, rather a short discussion about whether a second mediation session could be arranged. N.T. 10/15/01 (p.m.), p. 40. O'Brien expressed gratitude that his friend, teaching colleague, and former adversary was involved in the case as he (O'Brien) now had a trial lawyer who would discuss the case on the merits. N.T. 10/18/01 (p.m.), pp. 4-6. Also on that day, in preparation for the main meeting with O'Brien, there was a meeting between Michael Pansini, Steve Mezrow and Mr. Mongeluzzi at Mr. Mongeluzzi's office. N.T. 10/25/01 (am.), pp. 94-95. Later that morning, at the meeting with O'Brien, it was confirmed that the parties would resume the Murphy mediation and would do so promptly. N.T. 10/18/01 (p.m.), pp. 6-8.

(35) On March 18, 1999, the underlying cases settled for $15 million. The initial amount of attorneys' fees at issue was $7,122,355.50. At trial, however, plaintiffs amended their complaint to waive any claim to recover any percentage or portion of the additional money that defendants accepted from the Costellos, and instead stipulated to restricting their claims to the $6 million that defendants received pursuant to their fee agreements with the PECO action plaintiffs. N.T. 10/18/01 (p.m.), pp. 20-21.[14]

## V. CONCLUSIONS OF LAW

(36) Sadly, this case is, in large measure, one wherein credibility is of paramount importance. It is characterized as sadly inasmuch as the case hinges upon deciding which of two members of the bar is more credible. The inescapable conclusion is, that upon reading their respective testimony, one or both may suffer tarnished reputations as not being honest or ethical in some respect.

(37) However, this court is both judge and jury. As both, its mission is not simply to do justice, but rather as a jury, must find the facts and the logical inferences arising therefrom, utilizing a variety of factors, including common sense and human experience. Apply the law to the facts found, and render a verdict according to the law and the evidence.

(38) Under Pennsylvania law, an agreement to agree is not an enforceable contract. See *Onyx Oils & Resins*

---

14. See N.T. 10/18/01 (p.m.), p. 21. (Plaintiff Mongeluzzi's explicit statement that he was not claiming to be entitled to any monies as a result of the Costellos' expression of gratitude.)

*Inc. v. Moss,* 367 Pa. 416, 420, 80 A.2d 815, 816-17 (1951). "Where the existence of an informal contract is alleged, 'it is essential to the enforcement of such an informal contract that the minds of the parties should meet on all the terms as well as the subject matter. If anything is left open for future [negotiation], the informal paper cannot form the basis of a binding contract.' " [15] Defendants have stressed that an oral contract was entered between plaintiffs and defendants at a meeting on February 16, 1999. The record is replete with various inconsistent and diverse accounts of exactly what was stated by any and all persons present at that meeting. As to the material terms of the purported contract, all witnesses present at that meeting supplied one or more different terms at trial, denied the existence of terms, and disagreed as to the meaning of various terms purportedly referenced in a "follow-up" letter written by the plaintiff on February 22, 1999. The content of that letter was disputed as being misinterpreted, misused, and not encompassing the entire purported contract of February 16, 1999, and most importantly, *defendants contend that the February 22, 1999 letter was not the contract.*

(39) *The only fact that is not in dispute is that plaintiff agreed to perform work at the request of defendants.* Defendants argue that the "work" was to be a "catalyst" which would reinitiate the settlement discussions, and separately, the "work" was a host of possible additional tasks should defendants not settle the cases as hoped. Since there was no express written agreement as to what

---

15. *GMH Associates Inc. v. Prudential Realty Group,* 752 A.2d 889, 900 (Pa. Super. 2000), citing, *Isenbergh v. Fleisher,* 188 Pa. Super. 99, 106, 145 A.2d 903, 907 (1958).

the job of "catalyst" entailed, the court looks to the conversations of February 16, 1999 which purportedly created a contract. At trial, defendants explained that plaintiff Mongeluzzi's role of catalyst/trial attorney was conditioned upon the outcome of a variety of possible scenarios in futuro. That was nothing more than an agreement to perform some legal services, and a leap of faith that "down the road" the parties could amicably "work out" a payment arrangement for the services ultimately rendered. While this could be interpreted as a "barebones" contract, it was not. That is because both plaintiffs and defendants *"hedged"* their respective "bets" on whether it was "worth" the risk of losing a sizeable fee for their prospective efforts, against insisting on an "all my way or nothing" approach to an express contract. Thus, there was in fact no meeting of the minds as to this, nor many other material terms. Many of the material terms, and their varied interpretations, surfaced only after direct or cross-examination raised the issues. Even then, answers consistently demonstrated no meeting of the minds or worse, no prior meaningful discussion relative to an identified term. The February 16, 1999 discussions were between accomplished lawyers, not children bargaining among themselves to shovel snow from neighborhood sidewalks. All participants to the conversation had the ability to establish an express contract, orally or in writing, had they wished to do so.

(40) It is patently clear that the equitable doctrine of unjust enrichment cannot be used to compel payment where an express contract for same exists between the parties. See *Coldwell Banker Phyllis Ruben Real Estate v. Romano,* 422 Pa. Super. 319, 330, 619 A.2d 376, 381

(1993), *appeal denied,* 534 Pa. 635, 626 A.2d 1154 (1993); *In re Penn Central Transportation Co.,* 831 F.2d 1221, 1229 (3d Cir. 1987). The problem with finding an express contract is the inescapable conclusion that the testimony was replete with ambiguous and disputed definitions of terms, as well as incomplete, inconsistent, and, at times, incredible testimony regarding material terms, all occurring during an oral conversation between three men on February 16, 1999. The evidence is woefully inadequate upon which to find that an express contract existed in the first instance. Therefore, any argument as to the ambiguity or non-ambiguity of a specific term, or its inability to invalidate an existing express contract, is meritless.

(41) It is noteworthy that while basic contract law requires an offer and acceptance, as well as a meeting of the minds on material terms, the evidence demonstrates that when defendants were presented with a writing by Judge Adams as to his "understanding of their agreement," defendants initialed it and sent it back to indicate their acceptance of his written confirmation. *No such action was taken by defendants with regard to the Mongeluzzi letter of February 22, 1999.*[16]

(42) While this court acknowledges that *Banks Engineering Co. v. Polons,* 561 Pa. 638, n.4, 752 A.2d 883, 886 n.4 (2000), approves by reference, the Restatement (Second) of Contracts §204, wherein a trial court is permitted to supply a missing term in an express written contract, it does not impose upon the trial court a

---

16. See paragraph 8 hereinabove. See also, N.T. 10/16/01 (p.m.), p. 3, 10/16/01 (p.m.), pp. 3-34; N.T. 10/23/01 (p.m.), pp. 98-115.

duty to draft an express agreement where one never existed.

(43) This court further concludes that plaintiff is not barred on the basis of plaintiff's judicial admissions or plaintiff's allegedly "unclean hands."

(44) In support of their argument to the contrary, defendants quote *Durkin, Wilkerson,* and Professors Packel and Poulin and state that: "Under Pennsylvania law, verified allegations in pleadings and verified answers to interrogatories constitute judicial admissions." See *Durkin v. Equine Clinics Inc.,* 376 Pa. Super. 557, 568, 546 A.2d 665, 670 (1988), *appeal denied,* 524 Pa. 608, 569 A.2d 1367 (1989); *Wilkerson v. Allied Van Lines Inc.,* 360 Pa. Super. 523, 521 A.2d 25 (1987), *appeal granted,* 517 Pa. 594, 535 A.2d 81 (1987). "Judicial admissions are not evidence at all. Rather, they are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." Pennsylvania Evidence, Packel and Poulin (1999), §127. As a result, judicial admissions are conclusive, and a party may not offer evidence to attempt to contradict or dispute the judicially admitted facts. See Pennsylvania Evidence, Packel and Poulin (1999), §127.[17]

(45) There is no dispute that plaintiff, in his complaint,[18] testimony,[19] and interrogatories,[20] admitted to an agreement. "An allegation in a pleading which is spe-

---

17. See defendants' proposed findings and post-trial brief, p. 47.

18. See defendants' proposed findings and post-trial brief, exhibit 2.

19. See N.T. 10/16/01 (p.m.), p. 3; N.T. 10/19/01 (p.m.), pp. 7-8.

20. See defendants' proposed findings and post-trial brief, exhibit 7.

cifically denied in a defensive pleading does not constitute a judicial admission and may not be admitted into evidence." *General Equipment Manufacturers v. Westfield Insurance Co.,* 430 Pa. Super. 526, 542, 635 A.2d 173, 181 (1993). In both their answer and amended answer, defendants denied, without exception, the allegations of each and every paragraph in the complaint in which the word "agreement" appears in any form.[21] That such is not a contract is evidenced by the differing opinions as to what the agreement was. Plaintiffs argue the agreement was to perform work for a percentage of an anticipated multi-million dollar settlement or verdict, and defendants argue the agreement was performance of work in exchange for an hourly wage. The totality of the evidence belies any notion that plaintiff is barred from recovery by operation of law on this basis. A perceived agreement on a decision to perform work, resulting in a pleading acknowledging one side's understanding relative thereto, does not preclude a jury from deciding the existence of an express contract. This is so when the pleadings and evidence strongly suggest that the agreement was an agreement to defer resolution of the issue of compensation. Moreover, if defendants disagree with plaintiffs' interpretation or existence of the perceived pleaded agreement, a jury is required to resolve the issue.

(46) This court further concludes that plaintiff did not have "unclean hands." Defendants have articulated five reasons for claiming that plaintiff has unclean hands.[22]

---

21. See *e.g.,* "Response to 'introduction' in plaintiffs' complaint." Plaintiffs' proposed findings of fact and conclusions of law, exhibit 2.

22. See defendants' proposed findings and post-trial brief, pp. 80-83.

"The doctrine of unclean hands is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." See *Jacobs v. Halloran,* 551 Pa. 350, 710 A.2d 1098, 1103 (1998). (citations omitted)

(47) That plaintiff arguably did not clear his calendar to an extent which would satisfy defendants as to plaintiffs' ability to perform certain tasks, is not proof of unclean hands.

(48) That plaintiff met in secrecy likewise is not, in itself, proof of unclean hands. A permissible inference from said meeting is that it provided a benefit to the defendants.

(49) That PECO counsel may have voluntarily provided plaintiff with documents from the case is not proof of unclean hands. A permissible inference is that said discovery facilitated a settlement.

(50) That plaintiff failed to return one document out of legions is not proof of unclean hands. The speculative testimony in this regard was insufficient to prove unclean hands.

(51) The allegation that plaintiff and his expert witness, Roberta Pichini conspired to commit perjury was nothing more than that, an allegation. As such, said claim is meritless.

(52) Therefore, plaintiff is not barred from recovery by operation of law.

(53) This court further concludes that plaintiff is not precluded from sharing compensation in the *Costello* action. Plaintiffs performed work for defendants tantamount to an independent contractor or associated counsel status.[23] Plaintiffs worked for defendants, and not individual PECO plaintiffs. The evidence suggests that when plaintiff Mongeluzzi approached O'Brien in the one on one meeting, O'Brien's understanding was that plaintiff was going to bat for all PECO action plaintiffs to resolve all matters non-trial, or as the plaintiff Mongeluzzi's letter of February 22, 1999, suggests: to depose a host of witnesses relative to PECO's liability to all of the PECO plaintiffs. The *Miernicki, Richter,* and *Ackermann* cases cited by defendants are inapplicable.[24] Hence, plaintiffs are not barred from sharing in the settlement proceeds from the *Costello* action.

(54) This court further concludes that plaintiffs' letterhead is part and parcel of plaintiffs' value. The record is satiated with the accomplishments and reputation of plaintiff Mongeluzzi and his firm. Essentially, like everything else in the service industry, the better the service, the higher the premium for the service. As with most, if not all areas of the professional service industry, if a lawyer produces unparalleled results, the lawyer can, and usually does, charge more for his or her services. This is true in all fields, whether they be orthopedic surgery, entertainment, sports, criminal defense attorneys, or civil plaintiffs and defense lawyers. Certainly, defendants would not dispute the fact that the value of the

23. See *Johnson v. Hunter,* 2001 WL 1285886 (Tenn.Ct.App.) October 25, 2000.

24. See defendants' proposed findings and post-trial brief at 73-75.

services of their firm, in light of their PECO action results, has increased substantially. And while regardless of reputation, a standard contingency fee is generally the same among plaintiff personal injury lawyers, the significance of the "big gun" syndrome is that it generates more of those contingency fees. Thus, common sense and human experience permits the logical inference that the services of plaintiffs added significant value to the PECO action cases. *To argue that a new law school graduate with no experience could or would render comparable service is disingenuous and even ludicrous.* The critical issue, however, is how to arrive at a legally sound figure requisite of the value of the plaintiffs' services.

(55) "A large number of quantum meruit cases involve attorneys attempting to collect fees." *In re LaBrum & Doak LLP,* 225 B.R. 93 (Bankr. E.D. Pa. 1998). If quantum meruit can be justified, plaintiffs must establish the elements of the 10-factor test announced in *In re LaBrum & Doak, supra,* citing *LaRocca Estate,* 431 Pa. 542, 546, 246 A.2d 337, 339 (1968):

(1) The amount of work performed: The record reflects that the amount of work performed by plaintiffs was between 15-30 hours.

(2) The character of the services rendered: The record establishes that plaintiffs contacted PECO counsel O'Brien in an effort to both encourage settlement and apprise him of pending depositions. Plaintiff Mongeluzzi also received and became acquainted with the facts of the case pertinent to his designated responsibilities as an attorney working on the same.

(3) The difficulty of the problems involved: Plaintiffs came into a case that, based upon the totality of the evi-

dence, was at a virtual standoff and immovable. The record supports a finding that the relationship between counsel for PECO and defendants was "irretrievably broken." A catalyst of immense proportion would be needed to rekindle the fires necessary for a non-trial resolution or a full blown trial. This is contrary to the defense position that any lawyer with a license could have fit the bill. Regardless, defendants didn't seek just any lawyer, they sought and obtained the services of plaintiffs who, by the evidence, are renowned.

(4) The importance of the litigation: By all accounts, this litigation was the result of a catastrophic natural gas explosion which took lives, physically and mentally devastated many persons (including plaintiffs), and resulted in enormous property damage. There was great potential for punitive damages, as well as adverse publicity.

(5) The amount of money or value of the property in question: Defendants have estimated the worth of PECO in the "billions of dollars" category, and opined that just one percent in punitive damages would be enormous.

(6) The degree of responsibility incurred: Defendants argue that the tasks assigned to plaintiffs were barely more than ministerial. They have suggested that even a child could have performed the tasks. Again, however, it defies logic to conclude that if given the choice of a "somebody" or a "nobody," when the tasks are virtually meaningless, why would one choose (and have to pay for) the "somebody?" Clearly, the tasks were not meaningless and in actuality, only a prominent and highly successful advocate fit the profile defendants wanted. The number of outstanding depositions alone, and relatively short amount of time within which to complete all of

them, is a prime example of the degree of responsibility incurred by plaintiffs.

(7) Whether the fund involved was created by the attorney: The admissible evidence herein permits the reasonable inference that plaintiff Mongeluzzi's participation increased the value of all of the PECO action cases from $12.6 million to $15 million.

(8) The professional skill and standing of the attorney in his profession: The testimony of plaintiff, Ms. Pichini, and Mr. O'Brien speaks for itself. Plaintiff Mongeluzzi has an established record of extreme prominence in his chosen field.[25]

(9) The results plaintiff Mongeluzzi was able to obtain: While it is impossible to conclude with absolute certainty whether plaintiff's participation as of February 16, 1999 resulted in a specific dollar amount, it is clear that if his duty was to be a "catalyst," the record clearly supports the conclusion that his participation brought about PECO counsel O'Brien's desire for a non-trial resolution of the PECO actions.

(10) The ability of the client to pay a reasonable fee for the services rendered. (Moot)

(56) By their unjust enrichment claim, plaintiffs seek quantum meruit damages representing the fair value of plaintiff Mongeluzzi's services in helping both to bring about the settlement of the PECO actions and to increase the amount paid in settlement of those cases, thus providing a substantial benefit to defendants.

---

25. See N.T. 10/16/01 (p.m.), p. 3; N.T. 10/18/01(a.m.), pp. 3-9, for a list of plaintiff Mongeluzzi's accomplishments.

(57) Under the doctrine of unjust enrichment, a plaintiff is entitled to the quantum meruit value of services rendered to the defendant even in the absence of an enforceable contract. In such situations, the law will imply the existence of a contract and require the defendant to pay plaintiff the fair value of services rendered in order to prevent unjust enrichment.[26]

(58) In order to recover quantum meruit damages, plaintiffs must show that defendants either wrongfully secured or passively received a benefit under circumstances such that it would be unconscionable for them to retain that benefit without compensating plaintiffs therefor.[27] Specifically, plaintiffs must prove: (1) that they conferred a benefit upon defendants; (2) that defendants appreciated the benefit; and (3) that it would be inequitable for defendants to accept and retain the benefit without paying plaintiffs for the value of the benefit.[28]

(59) Defendant Pansini admitted during trial that plaintiff Mongeluzzi conferred a benefit upon Pansini.[29]

(60) Defendants' letter to plaintiff Mongeluzzi dated March 19, 1999, and the accompanying gifts, clearly demonstrated that defendants appreciated the benefit conferred.[30]

---

26. See *Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 290, 259 A.2d 443, 449 (1969).

27. See *Torchia on Behalf of Torchia v. Torchia*, 346 Pa. Super. 226, 233, 499 A.2d 581, 582-83 (1985).

28. See *Schenck v. K.E. David Ltd.*, 446 Pa. Super. 94, 97, 666 A.2d 327, 328 (1995), *alloc. denied*, 544 Pa. 660, 676 A.2d 1200 (1996).

29. See N.T. 10/16/01 (p.m.), p. 3; N.T. 10/24/01 (p.m.), p. 93.

30. See *LaBrum, supra*, wherein the court held that successor counsel appreciated the benefit conferred by enjoying or benefiting from the successful resolution of lawsuits that the plaintiff debtors had done substantial work on. *Id.* at 106.

(61) It would be inequitable for defendants to accept and retain the benefit without paying plaintiffs for the value of the benefit received. It is inequitable to allow a client or co-counsel to retain the benefit of an attorney's services without making a fair payment for those services. See *LaRocca Estate,* 431 Pa. 542, 246 A.2d 337 (1968); *Estate of Bruner,* 456 Pa. Super. 705, 713, 691 A.2d 530, 533 (1997); *Schenck v. K.E. David Ltd.,* 446 Pa. Super. 94, 97, 666 A.2d 327, 328 (1995), *alloc. denied,* 544 Pa. 660, 676 A.2d 1200 (1996); *Hiscott & Robinson v. King,* 426 Pa. Super. 338, 626 A.2d 1235 (1993) (court directed verdict for defendant client on claim for breach of contingency fee agreement, but awarded relief to plaintiff attorney pursuant to quantum meruit theory).

(62) In *Murdock v. Cohen,* 762 P.2d 691, 692 (Colo. Ct. App. 1988), the court awarded the plaintiff attorney an award based upon quantum meruit when the defendant attorney received a fee from the underlying plaintiff and never distributed it to the plaintiff attorney, who he had hired to assist with the case. The court held that a "benefit was appreciated by the defendant" in that the plaintiff attorney served as co-counsel and provided substantial assistance to the defendant in defending the case. *Id.* at 692.

(63) Here, as in each of the cases cited above, defendants retained an attorney who rendered extraordinarily valuable assistance to them, yet they have failed to pay Mongeluzzi any part, whatsoever, of the attorney fees that his actions helped produce.

(64) Quantum meruit involves a class of obligations imposed by law, regardless of the intent of the parties,

for reasons dictated by justice, and is based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby.[31]

(65) Clearly, the factors to be applied in a particular dispute, and the weight to be given to those factors, depends upon the unique circumstances of each individual case.[32]

(66) Thus, this court having fully weighed all of the admissible evidence, finds that defendants were unjustly enriched by the participation of plaintiffs in the PECO actions, and therefore plaintiffs are entitled to be compensated.

(67) Plaintiffs are additionally entitled to an accounting.

(68) Plaintiffs are entitled to the establishment of a constructive trust.

(69) The total sum at issue is $6 million. This court has carefully evaluated the plaintiffs' contribution, as well as the defendants' contribution as required by law.

Wherefore, this court awards plaintiffs the sum of $480,000, as well as pre-judgment interest on said amount at the statutory rate of six percent calculated from April 30, 1999 (the date on which defendants distributed the net settlement proceeds to the PECO action plaintiffs and retained the remainder).

---

31. See *Bednar v. Marino,* 435 Pa. Super. 417, 426, 646 A.2d 573, 578 (1994).

32. See *Mulholland v. Kerns,* 822 F. Supp. 1161,1169 (E.D. Pa. 1993).